IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TOYO TIRE & RUBBER CO., LTD. and TOYO TIRE U.S.A. CORP., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 14 C 0206 ) ) Judge John Z. Lee ) |
| ATTURO TIRE CORP. and SVIZZ-ONE CORPORATION, LTD., | ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Toyo Tire & Rubber Co., Ltd. and Toyo Tire U.S.A. Corp. ("Toyo"), brought this action against Defendants Atturo Tire Corporation ("Atturo") and Svizz-One Corporation, Ltd., alleging patent infringement, trade dress infringement, trade dress dilution, and other state law claims concerning certain vehicle tires. Atturo filed seven counterclaims arising under state common law and state and federal statutes. Toyo has moved for summary judgment as to all of Atturo's counterclaims based upon the *Noerr-Pennington* doctrine, arguing that the counterclaims arise out of Toyo's actions before the United States International Trade Commission (ITC) and are, therefore, protected from suit. For the reasons that follow, Toyo's motion for summary judgment [331] is denied.

**Background**

In 2013, prior to commencing its action before this Court, Toyo filed a complaint with the ITC, requesting that it investigate various manufacturers and distributors of foreign tires (the

1

"ITC respondents" or "respondents"). Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 5, 7, ECF No. 331-2. Toyo alleged that these respondents were importing and selling tires that it believed infringed various Toyo design patents. *Id.* ¶¶ 6, 8. Atturo was not among the named respondents, nor were any Atturo tires listed among the allegedly infringing tires in Toyo's complaint. Def.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 43, 45, ECF No. 340-3.

At Toyo's request, the ITC agreed to institute an investigation. Pl.'s LR 56.1(a)(3) Stmt. ¶ 11. The investigation, however, was never carried out. Instead, each of the respondents identified in Toyo's complaint (which, again, did not include Atturo) either defaulted, stipulated to consent orders, or entered into settlement agreements with Toyo, following which the ITC terminated its investigation as to each individual entity at Toyo's request. *Id.* ¶¶ 13–16.

The terms of the relevant settlement agreements and the manner in which the ITC terminated its investigation are central to the issues raised in the present motion. The settlement agreements, which were identical in all material respects, provided that the named respondent would refrain from importing and selling any "Accused Tires"—*i.e.*, the tires listed in the ITC complaint—as well as additional tires that Toyo believed infringed upon its intellectual property rights. *Id.* ¶ 26. One of these additional tires was the "Atturo Trail Blade M/T," a tire produced by Atturo. *Id.* ¶¶ 26, 28. Thus, notwithstanding the fact that neither Atturo nor the Atturo Trail Blade M/T was identified in Toyo's complaint, the named respondents agreed in their settlement agreements with Toyo not to sell the Atturo Trail Blade M/T. *Id.* ¶ 29; Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 52.

The agreements were negotiated, finalized, and executed solely between Toyo and the individually named respondents; the ITC took no part in the settlement negotiations. Def.'s LR 56.1 (b)(3)(C) Stmt. ¶¶ 50–51, 53. Moreover, the agreements contained no provision requiring

approval by the ITC or any other government agency prior to taking effect. *Id.* ¶¶ 50–51. Rather, the agreements were self-executing and became binding even before Toyo requested that the ITC terminate its investigation. *Id.*; *see* Mot. Summ. J. Hr'g Tr. 48:1–2, ECF No. 360 (statement by Toyo's counsel that the agreements were enforceable "as a matter of contract law").

Because the ITC was not involved in the settlement negotiations, the execution of the settlement agreements did not automatically terminate the ITC proceedings. And so, with two exceptions,[1] Toyo submitted the settlement agreements to the ITC along with requests that the ITC terminate its investigation of the named respondents. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 16, 18.

When reviewing a request to terminate a proceeding based upon a settlement agreement between the parties, the ITC regulations provide as follows:

> Regarding terminations by settlement agreement, consent order, or arbitration agreement under § 210.21 (b), (c) or (d), the parties may file statements regarding the impact of the proposed termination on the public interest, and the administrative law judge may hear argument, although no discovery may be compelled with respect to issues relating solely to the public interest. Thereafter, the administrative law judge shall consider and make appropriate findings in the initial determination regarding the effect of the proposed settlement on the public health and welfare, competitive conditions in the U.S. economy, the production of like or directly competitive articles in the United States, and U.S. consumers.

19 C.F.R. § 210.50(b)(2). Nowhere do the regulations require the administrative judge to consider the reasonableness or fairness of the settlement terms or any impact the settlement agreement may have on third parties directly.

---

[1] The two exceptions are a draft settlement agreement that Toyo sent to Doublestar Tyre ("Doublestar"), one of the respondents named in the ITC complaint, and a settlement agreement entered into with Vittore Wheel & Tire ("Vittore") and RTM Wheel & Tire ("RTM"), two other respondents named in the complaint. Def.'s LR 56.1(b)(3)(C) ¶¶ 60, 62. Because Doublestar filed consent order stipulations with the ITC and Vittore and RTM defaulted in the ITC action, Toyo did not submit the agreements to the ITC. Pl.'s Reply Supp. Summ. J. 2, ECF No. 344.

On November 20, 2013, Atturo submitted a letter in response to Toyo's requests for termination, noting its concern "that various executed and proposed Settlement Agreements in this investigation represent an abuse of the [ITC] process, and are being used to unfairly restrict competition in the United States market for tires." Pl.'s LR 56.1(a)(3) Stmt., Ex. 26, at 2, ECF No. 331-29. The ITC staff then reviewed Toyo's requests to terminate and provided its view for the administrative law judge's consideration. *See id.* ¶ 21.

In its written response, the staff at the ITC noted that it had no objection to Toyo's requests, stating that "the Staff does not believe that termination of the investigation based on the settlement agreement[s] at issue would be contrary to the public health and welfare, competitive conditions in the U.S. economy, the production of like or directly competitive articles in the United States, or U.S. consumers." *Id.* (citing 19 C.F.R. § 210.50(b)(2)). With respect to Atturo's letter, the staff stated that it "apparently was found not to raise public interest concerns that should prevent the settlements submitted in this investigation." *Id.* Soon thereafter, stating its agreement with the staff's analysis of these public interest factors, the ITC granted Toyo's request that it terminate the investigation. *Id.* ¶ 24. Although the ITC acknowledged that Toyo's request was "based upon" the various settlement agreements, *id.* ¶ 25, the ITC did not review the agreements for their specific impact on Atturo, nor did it mention Atturo in terminating the investigation, *see* Def.'s LR 56.1(b)(3)(C) ¶¶ 50, 58.

Toyo filed its suit against Atturo in this Court on January 13, 2014, asserting claims of design patent infringement, trade dress infringement, trade dress dilution, common law unfair competition, common law unjust enrichment, and violation of the Illinois Deceptive Trade Practices Act. Compl. ¶¶ 32–71, ECF No. 1. Atturo answered and asserted seven counterclaims: (1) common law tortious interference with existing contracts; (2) common law tortious

4

interference with prospective business expectancy; (3) common law defamation; (4) common law unfair competition; (5) common law unjust enrichment; (6) violation of the Illinois Deceptive Trade Practices Act; and (7) violation of § 43(a)(1)(b) of the Lanham Act. Am. Answer & Countercls. ¶¶ 100–66, ECF No. 39.

Atturo's counterclaims arise primarily from the settlement agreements that Toyo negotiated in the ITC action.[2] For example, in its first counterclaim, Atturo states that "Toyo used leverage as a Complainant in the Toyo ITC action to expand the scope of the settlement agreement with [one of the named ITC respondents] beyond the intellectual property at issue in the Toyo ITC Action to include false trade dress infringement allegations against the Atturo Trail Blade M/T Tire." *Id.* ¶ 105. On this basis, Atturo claims that "Toyo unlawfully tortiously interfered with an existing contract between Atturo and [one of the respondents]." *Id.* ¶ 108. On May 20, 2016, Toyo moved for summary judgment as to Atturo's counterclaims, asserting they are barred by the *Noerr-Pennington* doctrine.

## **Analysis**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In this case, the

---

[2]  Atturo's second through seventh counterclaims also rely upon on Toyo's draft settlement agreement with Doublestar and the agreement with Vittore and RTM, but neither of these documents was submitted to the ITC. *E.g.*, *id.* ¶¶ 112, 115, 121, 130, 132, 139, 141, 148, 150, 158.

parties acknowledge that no material facts are in dispute.³ Pl.'s Mem. Supp. Summ. J. 7–8, ECF No. 331-1; Def.'s Mem. Opp. Summ. J. 15 n.9, ECF No. 340. The sole issue is a legal one: whether the *Noerr-Pennington* doctrine immunizes Toyo from Atturo's counterclaims.

I. **The *Noerr-Pennington* Doctrine**

The *Noerr-Pennington* doctrine protects those who petition governmental actors for redress from liability based on their petitioning activity. *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–38 (1961); *accord United Mine Workers v. Pennington*, 381 U.S. 657, 669 (1965). The doctrine originated in the antitrust context based on two principles.

The first is that the antitrust laws, which generally bar concerted efforts by private actors to restrain trade, should not bar individuals from joining together in efforts to persuade governmental representatives to take action, even if similar concerted efforts to persuade private decisionmakers might be unlawful. *Noerr*, 365 U.S. at 137. This principle follows in part from basic notions of causation: namely, when the government acts based on petitioning, any purportedly unlawful result is most proximately caused by government action, not by the private petitioning. *See F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424–25 (1990); *Campbell v. City of Chi.*, 639 F. Supp. 1501, 1511 (N.D. Ill. 1986), *aff'd*, 823 F.2d 1182 (7th Cir. 1987). Conversely, where private parties take unlawful action merely hoping the government will later ratify it, government action is not an intervening cause, and *Noerr-Pennington* immunity does not arise. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503–

---

³ Atturo's memorandum in opposition to Toyo's motion highlights that Toyo's motion does not mention the draft settlement agreement with Doublestar and the agreement with Vittore and RTM that were not submitted to the ITC. Toyo does not dispute this fact. Pl.'s Reply at 2. Atturo also contends that summary judgment is not appropriate because there are genuine issues of material fact as to whether the "sham" exception to *Noerr-Pennington* immunity applies. Def.'s Mem. Opp. Summ. J. at 5, 13. Because the Court holds that Toyo's settlement agreements are not protected activity under *Noerr-Pennington*, there is no need to consider these issues.

04 (1988); *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 789 (7th Cir. 1999); *see also Superior Court Trial Lawyers Ass'n*, 493 U.S. at 424–25.

The second principle underlying *Noerr-Pennington* is that prohibitions on petitioning efforts "would raise important constitutional questions" under the First Amendment. *Noerr*, 365 U.S. at 137–38. Insofar as the antitrust laws would create liability that conflicts with the First Amendment right of petition, the right of petition should prevail. *See id.*

*Noerr-Pennington* has since evolved from these well-defined roots. The Supreme Court has recognized that the principles underlying the doctrine also warrant protection for individuals who "use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972). Thus, in addition to petitioning the legislature, instituting a lawsuit is protected petitioning activity under *Noerr-Pennington*. *Id.* Additionally, *Noerr-Pennington* immunity has expanded beyond the antitrust context out of the recognition that the doctrine's foundations—particularly those sounding in the First Amendment—have force beyond the antitrust laws. *See BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 526 (2002); *In re Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 911 (N.D. Ill. 2013) (observing that "the Seventh Circuit has applied the [*Noerr-Pennington*] doctrine broadly," and collecting cases in which the Seventh Circuit and other courts have applied *Noerr-Pennington* to claims arising under federal and state statutes and state common law).[4]

Additionally, *Noerr-Pennington* immunizes not only conduct that constitutes core petitioning activity, but also conduct with anticompetitive consequences "independent of any government action" insofar as the conduct is "'incidental' to a valid effort to influence

---

[4] The parties here do not dispute that *Noerr-Pennington* can apply to each of the different causes of action specified in Atturo's counterclaims, nor do they suggest *Noerr-Pennington* should apply differently to the different causes of action.

7

government action." *Allied Tube*, 486 U.S. at 499 (quoting *Noerr*, 365 U.S. at 143). Whether conduct is sufficiently "incidental" to petitioning activity to warrant immunity depends upon the "context and nature" of the conduct and the "source" of anticompetitive consequences. *Id.* at 499–500, 503–04. In making this determination, it is necessary to consider the fundamental nature of the conduct at issue and decide whether it is akin to traditionally unlawful activity, on the one hand, or tantamount to the political activity *Noerr-Pennington* is designed to protect, on the other. *Id.* at 506–07. To guide this analysis, the Supreme Court has held that enough incidental conduct must be protected so as to afford "breathing space" to the right of petition. *BE & K*, 536 U.S. at 531. In other words, some conduct that does not directly implicate First Amendment values should be protected so as not to chill core petitioning activity. *Id.*

On the other hand, an activity that is "mere sham"—*i.e.,* activity that "is actually nothing more than an attempt to interfere directly with the business relationships of a competitor"—is not entitled to protection under *Noerr-Pennington*. *Noerr*, 365 U.S. at 144. In the case of lawsuits, the Supreme Court has developed a two-part test for determining when a lawsuit is a "sham." "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). Winning lawsuits are *per se* immune, *id.* at 60 n.5, and courts have invariably held that lawsuits terminating in a favorable settlement are also objectively reasonable and are not shams, *New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007); *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008). If a court determines a suit is objectively baseless, it continues to the second part of the inquiry: whether the lawsuit "conceals 'an attempt to interfere *directly* with the business relationships of a competitor'" by using the lawsuit as an "anticompetitive weapon." *Prof'l Real*

*Estate Investors*, 508 U.S. at 60–61 (quoting *Noerr*, 365 U.S. at 144; *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991)).

## II. *Noerr-Pennington* Applied to Toyo's ITC Conduct

While *Noerr-Pennington* is understood to protect the act of filing a lawsuit (subject to the sham exception), it is less clear how the doctrine applies to other litigation conduct. There appears to be little dispute that "core petitioning activity" in the litigation context is limited to direct communications with the court. *See Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005) ("A complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something, can be described as petitions without doing violence to the concept."); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 892 (10th Cir. 2000). But less unanimity exists as to what litigation-based conduct—outside of direct court communications—would qualify as conduct "incidental" to petitioning activity, thereby qualifying for *Noerr-Pennington* immunity.

For example, courts generally agree that the content of presuit demand letters that threaten litigation or seek settlement is immune from suit under *Noerr-Pennington*. *In re Innovatio IP Ventures*, 921 F. Supp. 2d at 912 & n.5 (collecting cases). The question of whether the negotiation and execution of settlement agreements also fall under "incidental" conduct has met diverging views. *Compare Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991) (holding that "[a] decision to accept or reject an offer of settlement is conduct incidental to the prosecution of the suit and not a separate and distinct activity which might form the basis for antitrust liability"), *with In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 395 (D. Mass. 2013) (stating that "[c]ourts are largely

9

uniform in their view that private settlement agreements entered into during the pendency of litigation that are neither presented to nor approved by the judge presiding over the dispute fall outside the ambit of *Noerr-Pennington* immunity," and collecting cases).

Here, Toyo argues that the settlement agreements between it and the respondents in the ITC action are either core petitioning activity or conduct incidental to petitioning activity under *Noerr-Pennington*.[5] In support of its argument that the settlement agreements are core petitioning activity, Toyo points to the fact that it submitted the agreements to the ITC as part of its requests for termination of the ITC proceedings. The Court does not find this argument persuasive for a number of reasons.

It is necessary at the outset to precisely define the "activity" that is in dispute. Toyo would have the Court consider the "activity" to comprise the settlement agreements in their totality. But Atturo's counterclaims arise only from the specific provisions in the settlement agreements that restrict the respondents' ability to purchase and distribute Atturo's tires (the "Atturo provisions"). The other provisions that involve other tires are entirely irrelevant to Atturo's claims. Accordingly, the Atturo provisions in the settlement agreements between Toyo and the ITC respondents constitute the conduct for which Toyo is seeking immunity under the *Noerr-Pennington* doctrine. *See Allied Tube*, 486 U.S. at 499 ("The scope of [*Noerr-Pennington*] protection depends [ ] on the source, context, and nature of the anticompetitive restraint at issue."). Furthermore, before applying the *Noerr-Pennington* doctrine, the Court has to examine whether Toyo's challenged conduct is in fact related to the prosecution of the suit or "can be more fairly said to be outside of or unrelated to the petitioning activity." *United Tactical*

---

[5] In framing their arguments, the parties treat Toyo's conduct in this case as the conduct of a party in a lawsuit. Of course, the ITC is an executive agency and not a court, but the parties do not seem to believe this matters for present purposes, and they are likely correct. *See Cal. Motor Transp. Co.*, 404 U.S. at 510–11.

10

*Sys., LLC v. Real Action Paintball, Inc.*, Case No. 14-cv-4050-MEJ, 2016 WL 524761, at *6 (N.D. Cal. Feb. 10, 2016).

Viewed in this way, it is difficult to see how the submission of the Atturo provisions would constitute core petitioning activity in Toyo's proceedings before the ITC. Recall that Toyo's complaint does not even mention Atturo or Atturo tires, and there is nothing in the record to indicate that the scope of the requested investigation included Atturo or its tires. It only makes sense that the metes and bounds of core petitioning activity in the context of litigation must be determined by reference to the parties and claims to the suit. The jurisdiction of a court (or the agency tribunal in this case) is limited to the parties named in a complaint seeking redress and the scope of the claims alleged. Consider a hypothetical where Toyo and an ITC respondent enter into a settlement agreement without the Atturo provisions and then enter into a separate agreement where the respondent agrees to boycott Atturo tires. As Toyo's counsel conceded at oral argument, the latter agreement would not enjoy *Noerr-Pennington* immunity. Hr'g Tr. at 48:17–49:9. It would be odd to allow Toyo to insulate itself from liability simply by appending the provisions (which are not relevant to the proceedings) to the settlement agreements that it eventually submitted to the ITC. Toyo's efforts to shoehorn whatever claims it may have with respect to the Atturo tires into the ITC proceeding (when it could have, but did not, list them in its ITC complaint) under the guise of motions to terminate "conceals an attempt to interfere directly with the business relationships of a competitor" by using the ITC proceeding as an "anticompetitive weapon," thereby constituting a "sham" ineligible for *Noerr-Pennington* protection. *Prof'l Real Estate Investors*, 508 U.S. at 60–61 (internal quotations omitted).[6]

---

[6] To be clear, this is not to say that Toyo's complaint and the resulting ITC proceeding was a sham as a whole. Rather, Toyo's use of the ITC proceedings to immunize anti-competitive conduct against Atturo—a third party who was not mentioned in the ITC complaint—was a sham vis-à-vis Atturo. *See IPtronics Inc. v. Avago Tech. U.S., Inc.*, Case No. 14-cv-5647-BLF, 2015 WL 5029282, at *6–7 (N.D. Cal. Aug. 25, 2015) (to determine whether

This conclusion is buttressed by the fact that the settlement agreements were private agreements that did not require ITC approval to become effective in the first place. Although they were executed after the commencement of the ITC proceedings, the ITC did not mandate them or participate in their negotiation. Def.'s LR 56.1(b)(3)(C) ¶¶ 48, 50. Nor did the ITC require the negotiation of the agreements as a prerequisite to termination of its investigation. *Id.* The agreements delineated what tires the signators would and would not sell in the U.S. market and with whom they would and would not deal, Pl.'s LR 56.1(a)(3) ¶ 26, and were fully enforceable from their signing without regard to the ITC's later decision to terminate its investigation. Def.'s LR 56.1(b)(3)(C) ¶ 50. As the Seventh Circuit has recognized, the *Noerr-Pennington* doctrine "does not authorize anticompetitive *action* in advance of government's [or the ITC's] adopting the industry's anticompetitive proposal. The doctrine applies when such action is the consequence of legislation or other governmental action, not when it is the means for obtaining such action." *In re Brand Name Prescription Drugs*, 186 F.3d at 789 (emphasis in original). Here too the agreement between Toyo and the various ITC respondents with regard to Atturo was an action that was taken by the parties themselves, unrelated to the ITC proceeding.

Holding otherwise would allow actors to shield anticompetitive or tortious conduct that harms third parties simply by appending it to any host of motions in the course of a lawsuit. For example, *A* could sue *B* for breach of contract, agree to settle its suit against *B* with one of the conditions being that *B* breach an existing contract with *C*, file a motion to dismiss the suit against *B* with the settlement agreement attached, and then assert *Noerr-Pennington* immunity

---

ITC proceeding was a sham, court looked only to portion of proceeding related to the party against whom the *Noerr-Pennington* doctrine was being asserted). For this reason, Toyo's reliance on another court's decision concerning Toyo's actions before the ITC, *Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, No. SACV15246JLSDFMX, 2015 WL 4545187 (C.D. Cal. July 8, 2015), is misplaced. In that case, the court considered the *Noerr-Pennington* doctrine solely as applied to Toyo's actions before the ITC as such, not the settlement agreements at issue in this case. *Id.* at *3.

when later sued by *C* for tortious interference. The purposes underlying the *Noerr-Pennington* doctrine do not require such a result. Furthermore, allowing *C* to proceed with its claim against *A* would not unreasonably chill *A*'s right to petition the court with respect to its original claims against *B*. *See United Tactical Sys.*, 2016 WL 524761, at *7 (finding *Noerr-Pennington* did not apply where "at least some of the terms in the . . . settlement agreements and related agreed-on conduct go beyond the [party's] petitioning activities and its claims in [a prior action]"); *Select Portfolio Servicing v. Valentino*, 875 F. Supp. 2d 975, 987 (N.D. Cal. 2012) (finding *Noerr-Pennington* inapplicable because defendant's challenged conduct was based on a settlement agreement term unrelated to the petitioning activity in the underlying lawsuit); *cf. Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 13 (1979) ("Of course, a consent judgment, even one entered at the behest of the Antitrust Division, does not immunize the defendant from liability for actions, including those contemplated by the decree, that violate the rights of nonparties."). For these reasons, the Court finds that Toyo's submission of the Atturo provisions as attachments to its motions to terminate the ITC proceedings did not constitute core petitioning activity.

Alternatively, Toyo argues that the settlement agreements fall within the *Noerr-Pennington* doctrine because they are conduct incidental to its petitioning activity. This again requires the Court to look to the context and nature of Toyo's settlement agreements, as well as the source of the alleged resulting harm, with a mind to giving adequate breathing space to the right to petition. *Allied Tube*, 486 U.S. at 499–500, 503–04; *BE & K*, 536 U.S. at 531. In the end, Toyo's alternative argument also fails.

First, as discussed above, the agreements between Toyo and the ITC respondents regarding Atturo are beyond the scope of Toyo's complaint and the ITC investigation.

Accordingly, they were not incidental to Toyo's petitioning activity before the ITC. *See United Tactical Systems*, 2016 WL 524761, at *6 (denying immunity for conduct "outside of or unrelated to the petitioning activity"). Second, the settlement agreements were the product of negotiations between private parties, and the nature of the agreements is much the same: private contracts entered into between private parties. Such private settlement agreements fall outside of *Noerr-Pennington* immunity. *See Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 818–19 (D.C. Cir. 2001); *In re Nexium*, 968 F. Supp. 2d at 395 (collecting cases). This is true even in those cases where the parties obtain a consent judgment, signed and approved by a judge, that sets forth the terms of their settlement. *In re Nexium*, 968 F. Supp. 2d at 396–97. This is because, in such cases, the parties dictate the terms of the settlement and their actions are not intended to persuade a judicial officer to obtain a redress of grievances. *Id.*; *accord In re Androgel Antitrust Litig.*, Case No. 1:09-MD-2084-TWT, 2014 WL 1600331, at *7–8 (N.D. Ga. Apr. 21, 2014) (holding that consent judgments are akin to private agreements and not entitled to *Noerr-Pennington* immunity); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 212–13 (E.D.N.Y. 2003) (same); *see also In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 640–42 (E.D. Mich. 2000).

In response, Toyo contends that the settlement agreements in question were presented to and approved by the ITC administrative law judge as part of Toyo's motions to terminate the ITC proceedings. But this argument has several problems. As an initial matter, it ignores the fact that Atturo's counterclaims are also based on a number of settlement agreements that were never presented to the ITC. Am. Answer & Countercls. ¶¶ 112, 115, 121, 130, 132, 139, 141, 148, 150, 158. Furthermore, the settlement agreements that Toyo submitted to the ITC were a *fait accompli*. They did not need the approval of the ITC judge to become effective. Def.'s LR

56.1 (b)(3)(C) Stmt. ¶¶ 50–51; Mot. Summ. J. Hr'g Tr. 48:1–2.  Additionally, the Court is not persuaded that the ITC's review of the agreements—which was focused on broad public interest factors, Pl.'s LR 56.1(a)(3) ¶¶ 21, 24—specifically considered, and thus can plausibly be said to have endorsed, the injuries underlying Atturo's counterclaims.  Toyo's counsel admitted as much at oral argument.  Hr'g Tr. at 14:24–15:8.[7]  As a result, the Court finds that the settlement agreements at issue here (or, perhaps, more precisely, the parties' agreement as to Atturo) are similar to the party-negotiated consent judgments discussed above and fall outside of the *Noerr-Pennington* doctrine.

The cases upon which Toyo relies are readily distinguishable.  For example, *Campbell v. City of Chi.*, 639 F. Supp. 1501, 1511 (N.D. Ill. 1986), *aff'd*, 823 F.2d 1182 (7th Cir. 1987), involved a settlement agreement between two taxicab companies and the City of Chicago.  After reviewing the history of the settlement negotiations, including discussions that resulted in the passing of a favorable ordinance, the court found "the agreement reached here no more atypical than any other lobbying effort made by a powerful lobbyist."  *Id.* at 1511.  Similarly, *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001), involved a settlement agreement that was negotiated between various tobacco manufacturers and numerous states.  *Id.*

---

[7] The ITC staff's reference to a letter submitted by Atturo, which "apparently was found not to raise public interest concerns," Pl.'s LR 56.1(a)(3) ¶ 21, does not persuade the Court otherwise.  Toyo fails to specify who considered the letter and the basis for the staff's conclusion.  Additionally, the ITC's subsequent termination of the investigation made no mention of Atturo or its letter.  Def.'s LR 56.1(b)(3)(C) ¶ 58.  Toyo essentially argues that Atturo—like Toyo—had its opportunity to petition the ITC and cannot complain that it lost.  This argument has some superficial appeal.  But the fact that Atturo submitted a letter to the ITC regarding the propriety of the settlement agreements does not transform Toyo's submission of the settlement agreements into petitioning activity or conduct incidental to petitioning activity.  In effect, Atturo was left with two untenable choices.  It could ignore Toyo's actions before the ITC (after all, Atturo was not a party to the ITC proceedings or previously involved in them), or it could file its letter.  It chose to do the latter.  But, in doing so, Atturo was limited by the public welfare standard in § 210.50(b)(2).  It had no ability to oppose Toyo's motion or the settlement agreements on the ground that they would injure Atturo directly.  The ITC staff's opinion (which was adopted by the administrative law judge) that the settlement agreements did not injure competition in the domestic tire industry as a whole is hardly surprising.

at 253–54. Toyo also cites to *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525 (9th Cir. 1991), noting that, in that case, the Ninth Circuit found that even the acceptance and denial of a settlement agreement pre-litigation was entitled to *Noerr-Pennington* immunity. *Id.* at 1528. But the language in *Columbia Pictures* was dicta, and in any event, "[s]ubsequent courts have limited *Columbia Pictures*' holding to its facts, *i.e.*, cases involving the offer or rejection of a settlement." *United Tactical Systems*, 2016 WL 524761, at *6 (collecting cases).[8]

Finally, the Court finds that subjecting private settlement agreements such as Toyo's to liability will leave adequate breathing space for the right to petition courts or agencies for redress. Parties in Toyo's position remain free to file and settle their suits. The First Amendment values that lawsuits and similar agency proceedings implicate—notably, "compensation for violated rights and interests, the psychological benefits of vindication, [and] public airing of disputed facts," *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) (citations omitted)—will not be undermined by refusing to immunize Toyo's settlement conduct with respect to Atturo in this case.

Parties in Toyo's position have several different options. They can limit settlement agreements to the scope the original complaint and seek express approval of their terms from the judge. Or they can seek to include additional parties like Atturo, whose rights will be impacted

---

[8] Toyo's reliance on cases addressing other presuit activities, notably presuit demand letters, is also misplaced. Reply at 6 n.8; *see Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 933–36 (9th Cir. 2006); *In re Innovatio IP Ventures*, 921 F. Supp. 2d at 912 & n.5. There is good reason to distinguish presuit demand letters from settlement agreements like those at issue here. Presuit demand letters are a unilateral action, whereas the settlement agreements at issue here were not only bilateral in nature, but affected the rights of a third party. Additionally, settlement agreements do not implicate the same First Amendment values as presuit demand letters—notably, psychological vindication and the public airing of disputed facts—that courts immunizing presuit demand letters have noted. *Sosa*, 437 F.3d at 936; *see also In re Nexium*, 968 F. Supp. 2d at 396–97 (distinguishing presuit demand letters on the basis that they are aimed at "persuasion of a judicial officer to obtain a redress of grievances").

by the settlement agreements, to the proceedings. In this way, they can ensure that their conduct would qualify as core petitioning activity or conduct incidental to petitioning activity—precisely the type of activity that the *Noerr-Pennington* doctrine is intended to protect.

## Conclusion

For the foregoing reasons, the Court denies Toyo's motion for summary judgment based upon the *Noerr-Pennington* doctrine [331].

**IT IS SO ORDERED.**                    **ENTERED: 3/30/17**

_____
**JOHN Z. LEE**
**United States District Judge**