## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TOYO TIRE & RUBBER CO., LTD, et al.,

Plaintiffs,

v.

ATTURO TIRE CORPORATION, et al.,

Defendants.

Case No. 14-cv-00206

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiffs Toyo Tire & Rubber Co., Ltd. and Toyo Tire U.S.A. Corp. (collectively, "Toyo"), brought this action against Defendants Atturo Tire Corporation ("Atturo") and Svizz-One Corporation, Ltd., alleging in part that Atturo infringed the trade dress on Toyo's Open Country Mountain Tires ("OPMT tires"). For the reasons set forth below, the Court now rules on six *Daubert* motions as follows: Atturo's motion to exclude expert opinions of Toyo expert Michael Rappeport [405] is granted; motion as to Larry Chiagouris [411] is granted; and motion as to Charles Patrick [413] is granted. Toyo's *Daubert* motion as to Atturo expert Aric Rindfleisch [416] is granted in part and denied in part; motion as to Jeffrey Stec [417] is denied in large part; and motion as to Joseph Walter [419] is denied.

## BACKGROUND

On July 23, 2018, the Court granted Atturo's sanctions motion, barring Toyo from asserting that its trade dress is limited to the two-dimensional surface layer of the

OPMT tire's center and shoulder blocks. (Dkt. 502, hereafter, "Sanctions Order"). The Court ruled that "Toyo's failure to disclose the two-dimensional trade dress theory bars Toyo from asserting that the trade dress is limited to the two-dimensional surface layer of the OPMT tread. To the extent that Toyo wishes to proceed with this case, it will be restricted to the definition of trade dress that it disclosed during fact discovery, namely, 'the overall visual appearance and impression conveyed by the [commercial] Open Country M/T tire tread design.'" (*Id*.).[1]

## STANDARD

### A. Trade Dress

The Lanham Act protects trade dress, even if it is not registered, and authorizes civil actions against infringers. *See* 15 U.S.C. § 1125(a); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210, 120 S. Ct. 1339 (2000). "Trade dress, a distinctive appearance that enables consumers to identify a product's maker, is a form of trademark." *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 626 (7th Cir. 2010). "Trade dress refers to the total image of a product, including features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1067 (7th Cir. 1992) (internal citations and quotations omitted). A product's trade dress "includes a product design that is so distinctive it identifies the product's source." *Bodum USA, Inc. v. A Top New Casting Inc.,* 927 F.3d 486, 491 (7th Cir. 2019) (citations omitted).

---

[1] This order assumes familiarity with the background and procedural history of this case. The Court held oral argument on the parties' *Daubert* motions on February 27, 2019.

To prove trade dress infringement of unregistered trade dress, a plaintiff must establish: "(1) its trade dress is 'inherently distinctive' or has acquired 'secondary meaning'; (2) the similarity of the defendant's trade dress to that of the plaintiff creates a 'likelihood of confusion' on the part of consumers; and (3) the plaintiff's trade dress is 'non-functional'." *Computer Care*, 982 F.2d at 1068 (citations omitted); *see also Wal-Mart Stores, Inc.*, 529 U.S. at 210–211.

Secondary meaning "exists when consumers have come to 'uniquely associat[e]' the mark with a single maker." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 424 (7th Cir. 2019) (citation omitted). "To decide if there is a likelihood of confusion, we ask whether consumers who might use either product would likely attribute them to a single source." *Id.* at 425. As to functionality, the party seeking protection for unregistered trade dress bears the burden of proving that its trade dress is not functional. 15 U.S.C. § 1125(a)(3); *TrafFix Devices Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32, 121 S. Ct. 1255 (2001).

Functionality "imposes a critical limit on trade dress rights because 'product design almost invariably serves purposes other than source identification.' Because trademark protection for trade dress has no time limit, giving one competitor a perpetual and exclusive right to a useful product feature would result in a perpetual competitive advantage." *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 418 (7th Cir. 2017) (citations omitted). *See also Traffix Devices*, 532 U.S. at 29 ("[I]n *Wal-Mart Stores, Inc.*, 529 U.S. 205, we were careful to caution against misuse or

over-extension of trade dress."). In the Seventh Circuit, the factors considered in the functionality analysis are:

> (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost.

*Bodum USA, Inc.*, 927 F.3d at 492 (citation omitted).

## B. *Daubert* Standard

Under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the requirements of Federal Rule of Evidence 702 must be met before an expert can testify. The court evaluates the expert's qualifications, reliability of the methodology, and relevance of the testimony: "In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal citations and quotations omitted). District courts have "significant discretion under the flexible *Daubert* inquiry." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 818 (7th Cir. 2012). The burden is on the party seeking to admit the expert to show by a preponderance of the evidence that

the expert meets the requirements of Rule 702 and *Daubert. Gopalratnam,* 877 F.3d at 782.[2]

As the Seventh Circuit has explained:

> (t)he purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury…

*Lapsley*, 689 F.3d at 805. Because "there are many different kinds of experts, and many different kinds of expertise, . . .the gatekeeping inquiry must be 'tied to the facts' of a particular case." *Kumho Tire Co.*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591). Courts therefore review each conclusion of the expert in relation to the expert's education, skill, and training, and ask "not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him or her] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal citations and quotations omitted). With regard to reliability, "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *C.W. v. Textron,*

---

[2] Under Rule 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

*Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (internal citations and quotations omitted). The Court is also mindful of its "responsibility [under Fed. R. Evid. 403] to screen expert evidence for reliability and to determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury." *United States v. Schiro*, 679 F.3d 521, 529 (7th Cir. 2012). In this case, each party has the burden to show its expert testimony is admissible under *Daubert* and for Toyo, that its expert testimony is admissible under this Court's Sanctions Order.[3]

## ANALYSIS

### A. Atturo's Motion to Exclude Michael Rappeport's Expert Opinions

Atturo seeks to exclude the opinions of Toyo's proffered secondary meaning expert Michael Rappeport. Dr. Rappeport has his Ph.D. in Statistics and is a founding partner of RL Associates, a survey research and consulting firm. (Dkt. 405-2, Rappeport Report). Atturo does not challenge Dr. Rappeport's qualifications, but challenges his opinions as unreliable and not relevant. Atturo also argues that based on the Sanctions Order, the Court should bar Dr. Rappeport's testimony describing the wrong trade dress, meaning the two-dimensional surface configuration, and his conclusions based on the wrong trade dress. For the reasons stated below, Dr. Rappeport's opinions and testimony are barred.

---

[3] The Sanctions Order is the law of this case. "For purposes of consistency, finality, and judicial economy, the [law of the case] doctrine presumes that once a court has decided a particular issue in a case, the issue should not be reopened without good cause." *Boyer v. BNSF Ry. Co.*, 824 F.3d 694, 710–11 (7th Cir. 2016). "[T]he law of the case doctrine …reflects the rightful expectation of litigants that a change of judges mid-way through a case will not mean going back to square one." *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997).

Dr. Rappeport opined that "the tire tread of the Toyo Open Country M/T off-road tire has developed secondary meaning. In particular, it is my opinion that the appearance of the *two-dimensional* surface configuration of the tread ('Tread Pattern') [of the OPMT tire], has achieved secondary meaning as trade dress." (Rappeport Report ¶15) (emphasis added). He concluded that "the surface configuration of the tire tread of the Toyo OPMT tire, which is what Toyo has asserted as trade dress, has clearly developed secondary meaning." (*Id.* ¶43). Dr. Rappeport reached his opinion after conducting a "mystery shopper" survey of tire salespeople. (*Id.* ¶¶19, 20, 38.)

Atturo argues that Dr. Rappeport's survey of Toyo salespeople is unreliable and would confuse a jury because Dr. Rappeport surveyed the wrong universe—tire salespeople who are likely to associate the OPMT tire with Toyo. (Dkt. 405-1). Toyo responds that Dr. Rappeport's survey was appropriate since customers often buy tires in an "assisted buy" situation. (Dkt. 449; *see also* February 27, 2019 Transcript, Dkt. 553 (Feb. 27 Tr. at 16)).[4] Toyo disputes that there are any flaws in Dr. Rappaport's methodology. With regard to the trade dress definition, Toyo responds that Dr. Rappeport's opinion is not limited only to the two-dimensional surface and instead is consistent with "Toyo's position that the overall tread design *is made distinctive by* the surface appearance of its configuration." (Dkt. 513 at 10) (emphasis added).

---

[4] Atturo argues other methodological flaws in the survey including that (1) it did not assess secondary meaning for the appropriate timeframe; (2) the sample size was too small; and (3) the defined trade dress was the "two-dimensional surface configuration" but Rappeport used a three-dimensional image in his survey. Toyo responds that Dr. Stec, Atturo's survey expert also used a two-dimensional picture to conduct his secondary meaning survey. This is not true. The image Dr. Stec used is a three-dimensional image. (Dkt. 449-7 at 5).

### *1. The Sanctions Order*

The Sanctions Order precludes Dr. Rappeport's opinions about the two-dimensional trade dress. That order was clear that Toyo cannot "assert[] that the trade dress is limited to the two-dimensional surface layer of the OPMT tread." (Sanctions Order at 21). Dr. Rappeport's opinion is based on that exact definition of the trade dress. Toyo argues that, if anything, Dr. Rappeport should only be prevented from testifying that the trade dress is two-dimensional. (Dkt. 513 at 12). But allowing him to opine anew that the tread design is made distinctive by the surface appearance is inappropriate. Indeed the reason for the Sanctions Order was that Toyo disclosed a new definition of its trade dress *in its expert reports*. (Sanctions Order at 9, 16). Toyo cannot now offer another new definition of its trade dress.

### *2. Rule 26(a)(2)(B)*

Under Rule 26(a)(2)(B), an expert's written report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). "This requirement ensures that the opposing party has an adequate basis to examine the expert.…A party is barred from introducing evidence or testimony that it failed to disclose without substantial justification unless the failure was harmless." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 n.3 (7th Cir. 2013) (citing Fed. R. Civ. P. 37(c)(1)).

Toyo argues that paragraph 15 of Dr. Rappeport's report shows that he opined "that the OPMT tire tread, not just the 'Tread Pattern' acquired a secondary meaning

that was driven by the impression created by the appearance of the tread surface." (Dkt. 513 at 11). The Court disagrees. Dr. Rappeport expressly defined the "Tread Pattern" as the "two-dimensional surface configuration of the tread." (Rappeport Report ¶15). He tested whether that *Tread Pattern* of the Toyo OPMT tire has acquired secondary meaning as a trade dress." (*Id.* ¶17) (emphasis added). His hypothesis was that "[a] significant proportion of an appropriate universe is able to identify the source of the Toyo Open Country M/T tire based *solely on its Tread Pattern.*" (*Id.*) (emphasis added). He was clear that the "*surface configuration* of the tire tread" has developed secondary meaning. (*Id.* ¶43) (emphasis added). Toyo cannot now re-write Dr. Rappeport's report as providing two different opinions—one about a two-dimensional trade dress and one about a three-dimensional trade dress "driven by" the two-dimensional surface.

At his deposition, Dr. Rappeport testified that he understood the trade dress to be the "two-dimensional surface configuration." (Rappeport Dep. p. 66). When asked whether "any portion of the OPMT tire tread, which is shown in the OPMT survey picture, had more of an impact on the recognition of the tread pattern as a source indicator," he responded "no, I don't know anything about anything other than the totality." (*Id.* at p. 67). So Toyo's new interpretation of Dr. Rappeport's opinion is contradicted by Dr. Rappeport's own report and deposition testimony. To allow him to testify as Toyo requests would be to allow him to offer an opinion not previously disclosed. Atturo argues that this request must be denied under Rule 26(a)(2)(B).

Toyo did not respond to that argument.[5] Moreover, this Court already ruled, stressing Toyo's use of the word "has" in defining its trade dress, that Toyo "plainly implied that the blocks were *some of the components* of the trade dress." (Sanctions Order at 12-13) (emphasis added). Therefore under Rule 26(a)(2)(B), Dr. Rappeport cannot testify about a "dominant" or "distinctive" component theory.[6]

### 3. "Anti-dissection rule"

Under the "anti-dissection rule", where a plaintiff seeks protection for the overall appearance of its trade dress, the trier of fact's focus is the total appearance instead of individual elements in isolation. The Supreme Court in *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents* explained: "The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety." 252 U.S. 538, 545–46 (1920). In *Autozone, Inc. v. Strick*, the Seventh Circuit noted that the 'anti-dissection rule' "requires [trademarks] to be viewed in their entirety." 543 F.3d 923, 931 (7th Cir. 2008). In *Bodum USA, Inc.*, 927 F.3d at 492, the Seventh Circuit cited its prior

---

[5] At the February 27, 2019 hearing, the Court asked Atturo's counsel: "to the extent that Toyo is relying upon this either dominant component or distinctive component theory, was that raised by Toyo in any prior discovery or deposition during any other proceedings before this particular briefing?" (Feb. 27 Tr. at 84). Atturo's counsel responded "no." (*Id*.). When the Court asked Toyo's counsel the same question, Toyo's counsel argued that certain of its expert reports disclosed the theory, but did not otherwise identify when or how Toyo disclosed this theory in order for Atturo to have sufficient opportunity for discovery on the theory. (*Id*. at pp. 89–98). This Court already ruled that Toyo's disclosure of a new trade dress definition in its expert reports violated prior court orders and Rule 26(e). (Sanctions Order).

[6] Because the Court is granting Atturo's motion to exclude the expert opinions of Dr. Rappeport for the reasons discussed, it need not address Atturo's methodological challenges to Dr. Rappeport's survey.

decision in *Comput. Care*, 982 F.2d 1062 for the proposition that "where plaintiff seeks to protect overall appearance of its trade dress, [the] focus of analysis is on that total appearance rather than individual design elements in isolation."

Toyo concedes that its trade dress must be viewed as a whole (Dkt. 508), but argues that the anti-dissection rule does not bar it from asserting that certain features of its trade dress dominate. (Dkt. 513). But the Sanctions Order restricted Toyo to one trade dress definition—"the overall visual appearance" of the tread design—so Toyo now must prove that the overall appearance, or the elements in combination, acquired secondary meaning, and the similarity of Atturo's trade dress to Toyo's is likely to confuse consumers. *See Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 936 (7th Cir. 1989) (combination of elements "sufficiently unique to warrant trade-dress protection."); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 20 (7th Cir. 1992) ("[plaintiff] must demonstrate that [its product's] overall image…has acquired distinctiveness through secondary meaning."). "[T]he ultimate decision on infringement of trade dress is different from that of patent law and is determined by comparing the totality of the elements defined by plaintiff with the corresponding elements in the accused product and deciding if there would be a likelihood of confusion." 1 McCarthy on Trademarks and Unfair Competition § 8:3 (5th ed.).

Toyo argues that the case law Atturo cites is inapplicable because it involves defendants challenging a plaintiff's trade dress by arguing that certain elements of the trade dress are common or functional. This distinction is not convincing. In *Kibler v. Hall*, 843 F.3d 1068 (6th Cir. 2016), for example, the Sixth Circuit Court of Appeals

explained that *plaintiff's* "call for this court to 'focus on the dominant features of each mark and disregard the non-dominant features' is precisely what the anti-dissection rule forbids." *Id.* at 1078. *See also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992) ("Individual aspects of a trade dress may be eligible for trademark protection in their own right, but in an action for trade dress infringement each aspect should be viewed in relation to the entire trade dress."); *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2013 U.S. Dist. LEXIS 153806, at *6 (N.D. Ill. Oct. 25, 2013) ("The Lanham Act [] provides a private right of action to product manufacturers who believe that others are copying the overall image of their products and sowing confusion in the marketplace."); *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F. Supp. 870, 877 (N.D. Ill. 1992) ("[plaintiff] offered no evidence of secondary meaning in the overall trade dress.").

Courts have stated that "it is not a violation of the anti-dissection rule to 'separately view the component parts as a preliminary step on the way to an ultimate determination of probable customer reaction to the composite as a whole.'" *Louisville Mktg. v. Jewelry Candles, LLC*, 2016 U.S. Dist. LEXIS 153329, at *12 (W.D. Ky. Nov. 4, 2016) (internal citations omitted). Here, this litigation is well past the preliminary step of defining the elements of the asserted trade dress. Indeed Toyo's failure to sufficiently define its trade dress resulted in the Court's Sanctions Order. As to functionality, there is support for allowing an expert to opine about certain design elements to help the jury conclude whether the overall appearance of the trade dress is functional. *See Bodum USA, Inc.*, 927 F.3d at 492–93. But that does not mean

Toyo's experts can opine that the three-dimensional overall image acquired secondary meaning because of certain dominant features without opining on the overall appearance. That would be confusing to a jury tasked with determining whether, in the eyes of consumers, (1) the overall three-dimensional image acquired secondary meaning and (2) the totality of the elements creates a likelihood of confusion.

Toyo relies on *Health O Meter, Inc. v. Terraillon Corp.*, 873 F. Supp. 1160 (N.D. Ill. 1995). The court there discussed the "most prominent and inherently distinctive" feature of plaintiff's proposed trade dress, and decided that the more narrowly-defined trade dress *was* the trade dress for purposes of granting a preliminary injunction in favor of plaintiff. *Id.* at 1164. By contrast, here the Court rejected Toyo's attempt to narrow its trade dress because of discovery violations. Further, the court's ruling in *Health O Meter,* that plaintiff had a likelihood of success on a certain trade dress theory at the early preliminary injunction stage, is different from the issue here—whether Toyo's experts survive the *Daubert* inquiry particularly in light of the Court's ruling limiting Toyo to one definition of its trade dress four years after Toyo filed its case.

For the reasons stated, Dr. Rappeport is precluded from testifying.

### B. Atturo's Motion to Exclude Expert Opinions of Larry Chiagouris

Atturo seeks to exclude the opinions of Toyo's proffered secondary meaning expert Larry Chiagouris. Dr. Chiagouris has his Ph.D. in Marketing and Buyer Behavior, is the President of a marketing, branding and advertising consulting firm, and a Professor of Marketing at Lubin School of Business at Pace University. Atturo

challenges the reliability and relevance of Dr. Chiagouris' opinions, and his expertise as to one opinion on alleged copying by Atturo. For the reasons stated below, Dr. Chiagouris' opinions and testimony are barred.

Dr. Chiagouris opined that "Toyo Tire has established its trade dress as a means for distinguishing and serving as a source identifier for its OPMT tire." (Dkt. 411-2, Chiagouris Report, ¶16). He defined the trade dress as "the surface configuration of the OPMT tire tread as recognized by the District Court in its Summary Judgment ruling of September 15, 2016 in the California case against CIA Wheel Group et al." (*Id.* ¶16).[7] He opined that "Toyo Tire has invested substantial marketing and sales effort since 2000 in establishing its brand and related OPMT trade dress" and that effort "has produced substantial results, and established the OPMT tire trade dress in the marketplace." (*Id.* ¶¶124, 126).

Atturo argues that Dr. Chiagouris analyzed secondary meaning for the wrong population, wrong time period, and with respect to the wrong trade dress. (Dkt. 411). Based on the Sanctions Order, Atturo asks the Court to exclude those portions of Dr. Chiagouris's report and testimony in which he discussed the wrong trade dress and his conclusions about secondary meaning. (Dkt. 512). Atturo also requests that Dr. Chiagouris be precluded from testifying that consumers perceive the three-dimensional trade dress in two dimensions.

---

[7] *Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, 2016 U.S. Dist. LEXIS 129811, at *1-3 (C.D. Cal. Sep. 15, 2016) ("Toyo *only seeks to claim the two-dimensional pattern* created by the blocks—not the three dimensional structure created by the grooves between the blocks or the placement of thin shallow channels cut into the blocks known as sipes.") (emphasis added). That is different from the trade dress permitted to be litigated in this case in light of the Sanction Order. (*see* Sanctions Order at 16).

In response, Toyo argues that Atturo's reliance on the "anti-dissection rule" is misplaced, and Dr. Chiagouris' analysis of "one component or feature" of the trade dress is proper. (Dkt. 513). Toyo also asserts that "consistent with the Court's ruling that Toyo cannot assert that the trade dress is the two-dimensional surface layer, Dr. Chiagouris can certainly use the words 'feature,' or 'component' relative to the surface configuration rather than 'trade dress.'" (*Id.*)

At his deposition, Dr. Chiagouris confirmed his opinion was about the two-dimensional surface. When asked "is your understanding of what you're opining about the surface configuration of the blocks or the entirety of the tread?" Dr. Chiagouris responded, "It's the two-dimensional representation of the look and feel of the tire tread…that's my definition." (Chiagouris Dep. at p. 52). When asked about the "edge that is shorter on some of the shoulder blocks" Dr. Chiagouris responded "[i]t's not on the surface. It's not what people see in two dimensions. So it wouldn't be relevant." (*Id.* at p. 57).

Because he opined that the two-dimensional surface acquired secondary meaning, Dr. Chiagouris' report and testimony must be stricken under the Sanctions Order. Toyo argues that Atturo is "seeking to improperly transform the Court's ruling that Toyo cannot 'assert[] that the trade dress is the two-dimensional surface layer' [] into a ruling that Toyo cannot prove that the 'total concept and feel' emitted to consumers by the products' is that of the surfaces." (Dkt. 513 at 13). But Toyo cannot claim one trade dress and at the same time assert that consumers perceive something different. This Court already restricted Toyo's asserted trade dress to the overall appearance of

the tire tread. Similar to Dr. Rappeport, Toyo's attempt to use Dr. Chiagouris' testimony to assert a dominant component theory violates Rule 26(a)(2)(B) and the anti-dissection rule. Allowing Dr. Chiagouris to testify about one component of the trade dress as the only component that consumers see and that has acquired secondary meaning is not in line with the law when jurors will need to decide whether the overall image acquired secondary meaning. Similarly, Toyo's request that Dr. Chiagouris be able to use the words "component" and "trade dress" interchangeably would lead to juror confusion. *See Schiro*, 679 F.3d at 529 (court must weigh probative value of expert evidence against potential to confuse the jury).

Finally, Atturo argues that Dr. Chiagouris' statement that "the evidence indicates that Atturo Tire Corp. wanted to copy the OPMT design" (Chiagouris Report, ¶36) exceeds his expertise and is based on an incomplete record. While it is true that intentional copying can be evidence of secondary meaning (*see Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2015 U.S. Dist. LEXIS 116727, at *12 (N.D. Ill. Sep. 1, 2015)) secondary meaning, and copying, rely on a defined trade dress. Here that is the three-dimensional image, as required by the Sanctions Order. To permit Dr. Chiagouris to testify about the wrong trade dress and then opine that Atturo copied that (wrongly-defined) trade dress, would likely also lead to juror confusion and could prejudice Atturo.[8]

Accordingly, Dr. Chiagouris' testimony is barred.

---

[8] Because of this finding, the Court need not determine whether he has the expertise to opine on Atturo's copying.

**C. Atturo's Motion to Exclude Expert Opinions of Charles Patrick**

Atturo seeks to exclude the opinions of Charles Patrick, Toyo's proffered functionality expert. Patrick has his B.S. in Mechanical Engineering and has over 46 years of experience in the tire industry. Atturo does not challenge Patrick's qualifications but argues that he failed to properly analyze the asserted OPMT trade dress in its entirety, his methodology was faulty, and his opinions unsupported. (Dkt. 413-1). Atturo further argues that the effect of the Sanctions Order should be to fully exclude Patrick's opinions and testimony. For the reasons stated below, Atturo's motion to bar Patrick is granted.

Patrick opined that the "trade dress represented by the [OPMT] tread design is not 'functional'". (Dkt. 413-4, Patrick Report, ¶16). He defined the OPMT Trade Dress as "the 'overall look' of the two-dimensional shapes of the center blocks and shoulder blocks as designated in blue." (*Id.* ¶20).[9] In determining whether the trade dress was functional, Patrick considered the two-dimensional surface of the tire tread as the trade dress. Although Toyo argues that Patrick considered the tread design more broadly for his functionality analysis, a review of his report shows that he analyzed the functionality of the two-dimensional surface.

Throughout his report, Patrick discusses the two-dimensional surface as the trade dress. *See e.g.* Patrick Report, ¶48 ("As I understand Toyo's definition of the trade dress asserted in this case, it is the two-dimensional surface of the tire (the surfaces of the center blocks and shoulder blocks as show in blue above), as opposed to the

---

[9] The images referenced are Images A-E of Toyo's Cumulative Amended Answer to Atturo Interrogatory No. 3. *See* Patrick Report, p. 5.

three-dimensional shapes of the blocks.") and ¶¶21–24 (explaining how the two-dimensional design was discussed by Rule 30(b)(6) witness Mr. Ohara and by the Central District of California case in *Toyo v. CIA Wheel Group*). Indeed, Patrick's view on the distinction between two- vs. three-dimensional was that "the three-dimensional shape of the blocks…provide a *utilitarian advantage* to the tire" (emphasis added), in contrast to the two-dimensional surface, which is "the focus of the trade dress", provides "little advantage by itself", and is not functional. *Id.* ¶¶16, 20, 48.

Although in some cases it is helpful for an expert to opine on certain trade dress elements in order to determine whether the overall design is non-functional (*see Bodum USA, Inc. v. A Top New Casting, Inc.*, 2017 U.S. Dist. LEXIS 212249, at *17 (N.D. Ill. Dec. 28, 2017); *Bodum USA, Inc.*, 927 F.3d at 492–93), that is not what Patrick does here. As he confirmed at his deposition, Patrick considered the trade dress to be the two-dimensional surface. (Patrick Dep. pp. 120–25). To have him testify about the functionality of the wrong trade dress would be confusing to a jury. Further, Toyo's argument that Atturo seeks to "improperly remove from the jury the issue of what the distinctive features are that are responsible for the total image of the tread to consumers" (Dkt. 513 at 17) is not convincing. That was not Patrick's opinion, and as discussed above, the Court will not permit Toyo to assert a new theory including a dominant component theory at this stage of the litigation.

The Sanctions Order bars Patrick's opinions on functionality as well as copying.[10] Similar to Dr. Chiagouris, Patrick cannot opine about the wrong trade dress and then opine that Atturo tried to copy that trade dress (*see* Patrick Report, ¶57–59). Therefore Patrick's opinions and testimony are barred.[11]

### D. Toyo's Motion to Exclude Expert Opinions of Aric Rindfleisch

Aric Rindfleisch is Atturo's proffered expert on secondary meaning, likelihood of confusion and functionality. He is the John M. Jones Professor of Marketing and Executive Director of the Illinois MakerLab at the University of Illinois at Urbana-Champaign and has his PhD in marketing and sociology from the University of Wisconsin. Toyo moved to exclude Dr. Rindfleisch arguing that he is not qualified, his methodology was flawed and his testimony would not be helpful to the trier of fact. (Dkt. 416).[12]

Dr. Rindfleisch opined that:

- "the alleged OPMT trade dress has not acquired secondary meaning." (Dkt. 416-2, Rindfleisch Report, p.1).

- "Atturo has not used the TBMT in a manner that is likely to cause confusion, to cause mistake, or to deceive about the affiliation, connection, or association of Atturo with Toyo, or about Toyo originating, sponsoring, or approving Atturo's TBMT." (*Id*. at p.3).

---

[10] At the February 27, 2019 hearing, Toyo's counsel clarified that Toyo offered Mr. Patrick as an expert to opine on use or copied use, but not on customer confusion. (Feb. 27 Tr. at 31).

[11] In light of these findings related to Patrick, the Court does not address Atturo's other arguments for excluding his testimony.

[12] The parties agree that the Sanctions Order does not impact Toyo's arguments in its *Daubert* motion as to Dr. Rindfleisch.

- "advertising, marketing, and promotional materials for Toyo's OPMT tire tout the utilitarian advantages of Toyo's asserted trade dress and, therefore, [] the alleged OPMT trade dress is functional." (*Id*. at p.4).

- "the alleged OPMT trade dress is not a famous mark and [] Atturo's TBMT is not likely to dilute the allegedly famous trade dress." (*Id*.).

Dr. Rindfleisch also submitted a rebuttal report to Dr. Chiagouris and Mr. Patrick. (Dkt. 416-3).

### 1. Qualifications

Toyo argues that Dr. Rindfleisch has no experience in the tire industry, has never before attempted to determine secondary meaning or likelihood of confusion, his secondary meaning opinion is based on a misunderstanding, and he is not qualified to determine functionality. (Dkt. 416).

The Court does not agree that Dr. Rindfleisch's testimony should be barred because he is not an expert in tire marketing, designing, or sales. As described in his report and reflected in his CV, Dr. Rindfleisch has significant marketing experience and expertise. (Rindfleisch Report, p.4 and Exh. 1). That expertise will be helpful to the jury. "The fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016). *See also Smith v. Ford Motor Co.,* 215 F.3d 713, 720 (7th Cir. 2000) ("the district court erred in concluding that [the experts] were not qualified as experts in a relevant field solely because their expertise related to an area other than the one concerning the ultimate issue to be decided by the trier of fact."). The Court also will not bar Dr. Rindfleisch because this is his first time doing a secondary meaning or likelihood of confusion

analysis. "[T]here is a first time in court for every expert." *United States v. Garcia Parra*, 402 F.3d 752, 758 (7th Cir. 2005).

Toyo also argues that Dr. Rindfleisch's secondary meaning opinion is based on a misunderstanding because he testified at his deposition that trade dress must be "well-known" in the minds of consumers. In his report, Dr. Rindfleisch stated that he understood secondary meaning to mean "the alleged trade dress has come to be associated with one source of goods in the minds of ordinary purchaser and/or prospective purchasers of the alleged trade dress." (Rindfleisch Report at p. 6). Dr. Rindfleisch's use of the term "well-known" is not so far removed from the legal definition of secondary meaning to warrant precluding Dr. Rindfleisch's testimony altogether. The Court finds that Dr. Rindfleish's qualifications "provide a foundation for [him] to answer a specific question" (*Gayton*, 593 F.3d at 617) about whether the OPMT trade dress acquired secondary meaning and whether likelihood of confusion existed. Accordingly if Toyo believes Dr. Rindfleisch's misunderstood trade dress or secondary meaning, that can be tested on cross-examination at trial. *See Lapsley*, 689 F.3d at 805 ("the jury decide[s] ultimate issues of credibility and accuracy").

Finally, Toyo argues that Dr. Rindfleish is not qualified to determine functionality because he assessed only one factor of the functionality analysis. In his report, Dr. Rindfleish identified multiple factors considered in the functionality analysis, but then concluded that the OPMT trade dress is functional based on his assessment of only one factor. (Rindfleish Report at pp. 8–9, 103–104). A review of Dr. Rindfleish's report and CV show that he has the qualifications and experience to answer the

question of whether the marketing materials for Toyo's OPMT tire tout the utilitarian advantages of Toyo's asserted trade dress. That testimony will be helpful to the jury. However, his conclusion that the "alleged OPMT trade dress is functional" is barred. He analyzed only one factor of a multi-factor analysis, so to permit him to opine that the alleged trade dress is functional would effectively tell the jury what conclusion to reach. "Expert opinions on ultimate issues are not categorically impermissible. See Fed. R. Evid. 704(a). But Rules 403, 702, and 704(b) operate (if in different ways) to prohibit expert opinions that would 'merely tell the jury what result to reach.'" *United States v. Brown*, 871 F.3d 532, 539 (7th Cir. 2017). Dr. Rindfleisch may opine about how Toyo marketing materials touted the utilitarian advantages of Toyo's asserted trade dress, but it will be for the jury to decide whether that testimony, combined with other evidence, shows the asserted trade dress is functional. Therefore, both as an issue of Dr. Rindfleisch's qualifications and a Rule 403 issue, Dr. Rindfleisch is precluded from opining that the OPMT trade dress is functional.

### 2. Reliability and Relevance

Toyo challenges Dr. Rindfleisch's methodology for determining secondary meaning. Dr. Rindfleisch's methodology included reviewing testimony of tire industry members and end-users, the testimony of Toyo's corporate witnesses, a 2012 Google Tire Buyers Survey report of 1,365 tire buyers across the U.S., Dr. Stec's survey, more than 15 years of annual editions of *Tread Design Guide*, Toyo sales and customer figures, twelve years of Toyo advertisements, nine Toyo videos, Toyo's website, other media advertisements, materials for dealers, and the OPMT tire's place in the

market. Dr. Rindfleisch also visited a Toyo dealer store. (Rindfleisch Report at p. 11–71).

Toyo's challenges to Dr. Rindfleisch's methodology go to the weight, not admissibility, of his testimony. Criticisms of surveys generally go to the weight of expert testimony. *See Black & Decker Corp. v. Positec USA Inc.*, 2015 U.S. Dist. LEXIS 127193, at *62-63 (N.D. Ill. Sep. 22, 2015); *Bodum USA, Inc.*, 2017 U.S. Dist. LEXIS 212249, at *18. "While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (citation omitted). And Dr. Rindfleish can rely on surveys that he did not conduct himself. *In re James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir. 1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him."). Further, the Court finds Dr. Stec's survey methodology to be sound, so Dr. Rindfleish's reliance on the survey is not a basis to exclude Dr. Rindfleish's testimony. If Toyo believes Dr. Rindfleish did not have sufficient time to review Dr. Stec's survey before submitting his report, that is a topic for cross-examination.

Dr. Rindfleisch's in-depth analysis of numerous sources, combined with his marketing expertise and experience, show he relied on sufficient data and facts to reach his opinions. Toyo's challenges, such as that he relied on incomplete data about Toyo's advertising costs, are topics for cross-examination. *See Lapsley*, 689 F.3d at

805 ("the accuracy of the actual evidence is to be tested before the jury"). As the Seventh Circuit explained in *Smith*, 215 F.3d at 713:

> The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based. It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound.

*Id.* at 719 (citation omitted).

As to likelihood of confusion, Toyo argues that Dr. Rindfleisch provided no methodology to support his conclusions. However, in his report, Dr. Rindfleisch explains that he analyzed testimony in the case, reports from tire publications include *Modern Tire Dealer* and *Tire Review,* and applied marketing principles from scholarly research articles. Dr. Rindfleisch's methodology is sufficient to survive *Daubert* scrutiny. This is not a case where Dr. Rindfleisch's methodology is "[t]alking off the cuff--deploying neither data nor analysis" *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) or where the expert relies "solely or primarily on experience." Fed. R. Evid. 702, 2000 Advisory Committee Notes. As with secondary meaning, Toyo is free to cross-examine Dr. Rindfleisch about his likelihood of confusion opinion.

The Court finds Dr. Rindfleisch's opinions are relevant to issues in the case about secondary meaning and likelihood of confusion and will be helpful to the jury. "[I]n order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case." *Smith*, 215 F.3d at 720

(emphasis in original). Therefore Dr. Rindfleisch's opinions and testimony will be permitted, with two exceptions. The Court bars his opinion and testimony that "alleged OPMT trade dress is functional." His opinion that Atturo's TBMT is not likely to dilute the alleged trade dress is also excluded because there is no longer a dilution claim in the case. (*see* Dkt. 384 and Dkt. 508 at 10).

**E. Toyo's Motion to Exclude Expert Opinions of Jeffrey Stec**

Jeffrey Stec is Atturo's proffered secondary meaning and likelihood of confusion expert. He has his Ph.D. and Master's degrees in Economics from Ohio State University and is a Vice President with Charles River Associates, an international economic consulting firm. Toyo does not challenge Dr. Stec's qualifications but argues that his survey methodologies are flawed and unreliable, and his opinion does not assist the trier of fact. (Dkt. 417).[13]

Dr. Stec opined that "Atturo's TBMT tires do not create a likelihood of confusion"; and "Toyo's alleged trade dress does not have secondary meaning." (Dkt. 441-2, Stec Report, p.8). Dr. Stec conducted two surveys, on likelihood of confusion and secondary meaning. From his "Eveready" likelihood of confusion survey, he concluded that "Atturo's TBMT tires do not create a likelihood of confusion" with the OPMT tire. (*Id.* ¶¶17, 29). In his rebuttal report, Dr. Stec critiqued Dr. Rappeport's survey. (Dkt. 417-3, Stec Rebuttal Report, p. 5).

Toyo takes issue with several aspects of Dr. Stec's methodology including the universe surveyed, the survey questions, sampling method, and use of the Everready

---

[13] The parties agree that the Sanctions Order does not impact Toyo's *Daubert* motion as to Dr. Stec.

survey format. Dr. Stec's report explains in detail the reasons for selecting the particular survey formats, universe, and questions, as well as the results. The Court does not have concerns that Dr. Stec did not employ a rigorous, objectively-verifiable approach. Further, criticisms of surveys generally go to the weight, not the admissibility, of expert testimony. *See AHP Subsidiary Holding Co.,* 1 F.3d at 618; *Black & Decker Corp.,* 2015 U.S. Dist. LEXIS 127193, at *62–63. This is not the rare situation in which the surveys are "so flawed as to be completely unhelpful to the trier of fact." *AHP Subsidiary Holding Co.*, 1 F.3d at 618. And the "Everready" survey format "has been described as the 'gold standard' in cases involving strong marks, [] and is a 'widely accepted,' though not exclusive, 'format to prove the likelihood or non-likelihood of confusion.'" *Black & Decker Corp. v. Positec USA Inc.*, 2017 U.S. Dist. LEXIS 147463, at *10-11 (N.D. Ill. Sep. 11, 2017) ((quoting McCarthy on Trademarks). Toyo can challenge Dr. Stec about his surveys on cross-examination, including whether the Everready format or another format was appropriate for this case.

Toyo argues that the results of the flawed surveys make them "unreliable on the relevant issues." (Dkt. 417 at 16). The Court disagrees and finds his testimony will help the trier of fact to determine issues in the case about secondary meaning and likelihood of confusion. However, similar to Dr. Rindfleisch, Dr. Stec's opinion about dilution is stricken.

**F. Toyo's Motion to Exclude Expert Opinions of Joseph Walter**

Joseph Walter is Atturo's proffered tire functionality expert. Dr. Walter has a Ph.D. in Engineering Mechanics from Virginia Polytechnic Institute and more than 40 years of professional experience in the tire industry. Toyo challenges Dr. Walter based on his qualifications, methodology and relevance. Atturo and Toyo disagree about whether the Sanctions Order impacts Walter's testimony. Much of Toyo's critique of Dr. Walter, Atturo contends, is based on Toyo's erroneous claim that Dr. Walter evaluated the "wrong" trade dress.

Dr. Walter opined that "aspects of the appearance of the asserted OPMT trade dress are dictated by the intended purpose and desired performance characteristics of the OPMT tire", that "the design of the OPMT tread pattern focused on performance factors and was based on the common four-block mud tire tread pattern that had long been used by Toyo's competitors" and that "Toyo's asserted OPMT trade dress is functional." (Dkt. 419-2, Walter Report, pp. 7, 9). Dr. Walter's rebuttal report critiques the Patrick Report.

*1. Qualifications*

Toyo contends that Dr. Walter's lack of expertise in competition, advertising, marketing, or consumer perception bar him from opining on functionality and confusion issues. But Dr. Walter's opinion is about functionality, not likelihood of confusion. His report and CV show that he has the expertise and experience to opine on functionality. Toyo does not explain why Dr. Walter cannot opine about functionality without expertise in marketing and consumer perception. Indeed a

number of the functionality factors require the type of engineering background Dr. Walter has. *See Bodum USA, Inc.*, 927 F.3d at 492 (listing factors considered in functionality analysis including the existence of a utility patent and ability to create alternative designs); *see also Traffix Devices*, 532 U.S. at 31 ("[T]he disclosure of a feature in the claims of a utility patent constitutes strong evidence of functionality."); *Bodum USA, Inc.*, 927 F.3d at 492–93 (no one functionality factor is dispositive). Dr. Walter evaluated the functionality factors as a tire technology expert and explained the bases for his opinions.

### 2. Reliability and Relevance

The Court finds Dr. Walter's opinions are supported by sound methodology and will assist the trier of fact. The Court does not agree with Toyo that Dr. Walter's opinions are supported only by speculation. Dr. Walter's report provided extensive detail about how Toyo's tread design affects tire performance and the bases for his conclusions. Toyo's challenges to Dr. Walter's alleged flawed understanding of trade dress and functionality are subjects for cross-examination. *See Stollings*, 725 F.3d at 765 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.") (citation omitted); *Lapsley*, 689 F.3d at 805 ("the jury decide[s] ultimate issues of credibility and accuracy").

Toyo also argues that "Dr. Walter's methodology is also flawed because he is racially biased against the Japanese." (Dkt. 419 at 18). Atturo responds with a section of Dr. Walter's deposition testimony where he disavowed prejudice against Japanese

nationals. (*see* Dkt. 443 at 17). The claim of racial bias is serious, but Dr. Walter's report and testimony do not demonstrate that his opinions were based on bias rather than scientific methods. *See Brown v. Burlington N. Santa Fe Ry.*, 765 F.3d 765, 775 (7th Cir. 2014) (expert must rely not on his own subjective experience or bias but on reliable scientific methods); *Loeffel Steel Prods. v. Delta Brands*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005) ("Bias goes to credibility, and credibility is a question exclusively for the trier of fact.").

### 3. Effect of the Sanctions Order

The Sanctions Order obviates the need to address Toyo's argument that Dr. Walter considered the wrong trade dress when he did not analyze the two-dimensional trade dress. Nevertheless, Toyo contends that Dr. Walter "never confirmed how consumers perceived the OPMT trade dress, and thus what features were distinctive or generic relative to the 'overall visual appearance and impression conveyed by' the OPMT tire." (Dkt. 508 at 12). First, Dr. Walter opined on functionality, not secondary meaning or likelihood of confusion. Second, Toyo does not cite authority to support its argument that in order to evaluate functionality, Dr. Walter was required to opine on how consumers perceived the OPMT trade dress.

### CONCLUSION

For the stated reasons, Atturo's motion to exclude expert opinions of Toyo expert Michael Rappeport [405] is granted; motion as to Larry Chiagouris [411] is granted; and motion as to Charles Patrick [413] is granted. Toyo's *Daubert* motion as to Atturo expert Aric Rindfleisch [416] is granted in part and denied in part; motion as to

Jeffrey Stec [417] is denied in large part; and motion as to Joseph Walter [419] is denied.

Status hearing is set for January 28, 2020 at 9:00am.

E N T E R:

Dated: December 20, 2019

_____
MARY M. ROWLAND
United States District Judge